**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

C.H., a minor, by and through his parents Douglas and Jolene Hepperlen,

      Plaintiff(s),

v.

Douglas County School District, RE-1,

      Defendant.

---

## COMPLAINT

---

Plaintiff, C.H., a minor, by and through her parents, Douglas and Jolene Hepperlen, through counsel Kishinevsky & Raykin, submit the following Complaint.

### I. PARTIES

1. Plaintiff, C.H., is a child with a disability as that term is defined in the Individuals With Disabilities Act ("IDEA"), 20 U.S.C. §1401(3), and Colorado's Exceptional Children's Educational Act ("ECEA"), Colo. Rev. Stat. §22-20-103(5)(a)(I).  Douglas Hepperlen ("Mr. Hepperlen") and Jolene Hepperlen ("Mrs. Hepperlen") (or collectively "Parents"), are the natural parents of C.H. pursuant to 20 U.S.C. §1401(23(A)), and C.R.S. §22-20-103(19.7)(a)(1).  C.H. was enrolled in Douglas County School District RE-1 from 2016 to 2020.

2. Defendant, Douglas County School District RE-1 ("School District"), is a school district organized under the laws of the State of Colorado, C.R.S. §22-30-101 et seq and as defined

by the ECEA at C.R.S. §22-20-103(22). The School District is a "local educational agency" ("LEA") as the term is defined in 20 U.S.C. §1401(19)(A).

## II. JURISDICTION AND VENUE

3. This Court has jurisdiction to hear this matter pursuant to 20 U.S.C. §1415(i)(2)(A) and 20 U.S.C. §1331.

4. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

## III. GENERAL ALLEGATIONS

5. Under the IDEA, states must ensure that a free and appropriate public education ("FAPE") is provided to students with disabilities. 20 U.S.C. §1412(a)(1)(A).

6. A FAPE consists of special education and related services that meet the standards of the State educational agency and are provided in conformance with an individualized education program ("IEP"). 20 U.S.C. §1401(9).

7. An IEP is a written statement of the child's present levels of educational performance, including how the child's disability affects his involvement and progress in the general curriculum, a statement of measurable annual goals and short term objectives, a statement of special education services that are to be provided to the child, and an explanation of the extent to which the child will not participate with non-disabled students. 20 U.S.C. §§1401(14) and 1414(d)(1)(A).

8. Special education consists of instruction that is specially designed to meet the unique needs of the child. 20 U.S.C. §1401(29).

9. Child Find is the affirmative, ongoing obligation of states and local districts to identify, locate, and evaluate all children with disabilities residing within the jurisdiction who are in need of special education and related services. 34 C.F.R. 300.111(a)(1)(i). Child Find must include

children who are suspected of being children with disabilities under 34 C.F.R. 300.8 and in need of special education services, even if they are advancing from grade to grade. Because the Child Find obligation is an affirmative one, a parent is not required to request that a district identify and evaluate a child.

10. Part of a district seeking out potentially eligible students under Child Find is watching for red flags among its students and referring students who may have a disability and need special education. *Cincinnati City Schs.,* 12 ECLPR 111 (SEA OH 2015).

11. Parents who believe that the local education agency ("LEA"), i.e., the school district, has not met its obligations under the IDEA may file a due process complaint to have the dispute resolved at an impartial due process hearing conducted by the SEA. 20 U.S.C. §1415(f)(1)(A); 1 C.C.R. 301-8, 2220-R-6.02(7). In Colorado, the due process hearing is conducted by an administrative law judge ("ALJ") with the Colorado Office of Administrative Courts. ECEA Rule 6.02(7.5)(c).

12. A party aggrieved by the findings and decision of the ALJ has the right to bring a civil action in federal court. 20 U.S.C. §1415(i)(2)(A); ECEA Rule 6.02(7.5)(j)). The reviewing court receives the record of administrative proceedings and bases its decision on the preponderance of the evidence in the record. 20 U.S.C. §1415(C).

13. C.H.[1] is a 15-year-old student, who formerly attended STEM School Highlands Ranch ("STEM" or "School"), a charter school within the District.

14. C.H. was a student at STEM during the 2016-17 academic year, 2017-18 academic school year, 2018-19 academic year, and 2019-2020 academic year.

---

[1] While a student at STEM, C.H. used the pronouns "he/his"; C.H.'s preferred pronouns are now "she/her".

15. Since the beginning of her time at STEM, C.H. consistently performed very well on standardized tests, often testing above the ninetieth percentile and above grade level.

1. Accordingly, she was placed on an Advanced Learning Plan in fifth grade and identified as gifted and talented.

2. Yet despite her measurable intelligence, C.H.'s grades fluctuated throughout every semester as she was unable to maintain pace with the workload.

3. In seventh grade (2018-2019 school year), C.H. received a D in Algebra I, a D in French, a C in Language Arts C in Science, a C in Social Studies, a B in Computer Science II and a B in PE during her first semester.

4. During her second semester of seventh grade, C.H. received a C in Language Arts, a C in Algebra I, a C in Science, a D in Real World Economics, a D in French, and a C in Lego Robotics.

5. Though passing her classes, C.H.'s grades indicated that she was not able to succeed at the level expected given her high intelligence, particularly because she seemed to understand the academic content, but still could not produce the work product necessary to ensure her academic success.

6. C.H. began struggling more when STEM switched to a block schedule consisting of 90-minute classes as C.H. had trouble focusing in class for that extended period of time.

7. In February 2019, the spring of C.H.'s seventh grade year, her Language Arts teacher Rebecca Mauch emailed Parents informing them that the seventh grade teachers had decided to implement a Response to Intervention (RTI) to address C.H.'s poor academic performance.

8. Parents received no updates regarding the RTI measures put into place for C.H in February 2019.

9.  C.H.'s grades did not improve.

10. On May 7, 2019, while C.H. was attending STEM, two students entered the school and fired several gunshots into a Language Arts classroom and another location.

11. C.H. was present at STEM during the shooting. One of the bullets fired during the incident grazed one of C.H.'s classmates. Another student was shot and killed across the hall from where C.H. was located.

12. Despite C.H.'s exposure to such a traumatic event, STEM did not attempt to monitor and evaluate C.H. as an individual who may require mental health or other supports to access the general education curriculum.

13. Later in the 2019 school year, Parents became concerned that C.H. was having increased difficulty concentrating in class and completing her work. She also had trouble following directions, misheard what other people said, felt anxious, and was sensitive to loud sounds.

14. C.H. was especially struggling with foreign language, math, and handwriting.

15. As a result of their concerns, in July of 2019, Parents took C.H. to the Gifted Development Center ("GDC") in Westminster, Colorado to better understand why C.H. was consistently struggling year after year in school, despite being gifted.

16. Parents filled out an extensive parent questionnaire and them met with one of the GDC directors Bobbie Gilman ("Mr. Gilman"), who shared that C.H. could have numerous potential disabilities that Parents should have C.H. evaluated for.

17. Parents took  C.H. to Able Kids Foundation for a central auditory processing evaluation on August 21, 2019. They consulted with the Gifted Development Center, which suggested that C.H. be tested for Auditory Processing Disorder as well as Sensory Processing Disorder.

18. The purpose of a central auditory processing evaluation is to determine the integrity of one's central auditory nervous system ("CANS"). A typical CANS matures or improves as one ages, and the CANS typically matures between 10-11 years of age. Deficits in CANS can result in a decreased ability to process or interpret auditory information, which can, in turn, directly impact a child's performance in school.

19. C.H.'s evaluation showed that C.H. had difficulty when complementary input was presented in both ears simultaneously. According to the evaluation, individuals who have increased difficulty with this task often have problems suppressing ambient noise and have challenges when trying to concentrate in environments with background noise.

20. C.H. also showed difficulty during the Speech-In-Noise test. During this test, C.H. was given word lists while listening to background noise and asked to repeat the words. This test showed that both of C.H.'s ears appeared challenged with that auditory task.

21. A Masking Level Differences test found that C.H. fell below normal limits for the speech condition. This test also suggested challenge in the area of synchrony between the two ears.

22. Overall, C.H.'s performance on the central auditory test battery revealed a decrease in function with processing or interpreting auditory information as compared to other students his age.

23. Based on all tests conducted during the evaluation, C.H. was determined to have central auditory processing disorder ("CAPD"). According to the evaluation, "[t]his suggests that [s]he will have problems processing or interpreting auditory information when presented in a less than quiet listening environment. [C.H.'s] inefficient CANS may make it difficult to concentrate in environments when background noise is present. Understanding verbal messages will also be more difficult when trying to listen with even subtle ambient noise in

the background. If [s]he misses one or two words in verbal instructions it will interfere with [her] ability to understand information in difficult auditory settings. In addition, listening for long periods of time may be particularly tiring for [her]."

24. The Able Kids Foundation report also commented that foreign languages would be difficult for C.H. The following recommendations were made for C.H. based on the evaluation: preferential placement in lecture or group settings, earplugs/earmuffs to be worn during desk and study activity, placement in a quiet and low-activity room for reading, exam completion in a separate environment, cross-checking instructions, written instructions on classroom assignments, one-step directions, and receiving copies of lecture notes.

25. It was also recommended that C.H. be given classes that rely heavily upon the auditory transmission of information during the initial part of the morning and afternoon and that [s]he be allowed to use a keyboard for academic work.

26. A custom filter was designed for C.H. for [her] right ear to decrease background noise. It was made available through the Able Kids Foundation.

27. On August 30, 2019, Parents met with Coleen Sullivan ("Ms. Sullivan"), C.H.'s middle school counselor because they had concerns about C.H.'s anxiety and how she was doing academically.

28. Parents shared with Ms. Sullivan that they had taken C.H. to GDC and were told of many potential disabilities C.H. could have. They informed Ms. Sullivan that they were going to be begin testing in those different areas, specifically mentioning that they had scheduled a parent intake meeting at the STAR Institute for the following week. The STAR institute would be assessing C.H.'s sensory processing issues.

29. Parents provided Ms. Sullivan with a copy of the Able Kids Foundation report.

30. Parents also explained to Coleen that they had been advised by the

31.  Around the same time that Ms. Sullivan received the Able Kids Foundation report, Ms. Sullivan met with C.H. a few times after Parents shared that C.H. had felt anxious about returning to school that year following the school shooting and also because she had been unable to keep up with the workload the previous year.

32. Ms. Sullivan also knew C.H. because she had previously invited her to be part of a middle school transition group intended to help students identified as likely to need assistance transitioning to middle school because of either social or academic concerns.

33. On October 3, 2019, Stem held a 504 meeting to determine whether C.H. needed a 504 plan, given the newly discovered diagnosis of CAPD.

34. Prior to this meeting, C.H.'s teachers had again referred C.H. for RTI that fall but had decided to hold off on implementing any new interventions due to the upcoming 504 evaluation and meeting.

35. During the October 3, 2019, 504 meeting, Mrs. Hepperlen arrived late because of traffic caused by the school drop-off line. Mrs. Hepperlen informed the school that she was running late, but by the time she made it to the meeting, all of C.H.'s teachers had already returned to their classrooms to teach.

36.  Because of this, Mrs. Hepperlen received no feedback or insight from C.H.'s teachers directly.

37. The 504 eligibility determination only included Ms. Sullivan's subjective summaries of the information provided by C.H.'s teachers.

38. Without allowing Mrs. Hepperlen to first provide her own input, Ms. Sullivan informed Mrs. Hepperlen that C.H. was already found ineligible for a 504 plan.

39. Ms. Sullivan did, however, assure Mrs. Hepperlen that the team would reconvene in the mid-November to reassess whether a 504 plan was necessary.

40. The team never reconvened in November.

41. Upon information and belief, STEM never conducted a formal evaluation to determine whether C.H. qualified for special education services or a 504 Plan.

42. That fall semester, C.H. failed her French class and removed French from her class schedule for the following semester.

43. During the fall semester, Parents also informed Ms. Sullivan that they were seeking an evaluation for C.H. from STAR Institute to assess C.H.'s serious sensory issues.

44. When STEM's spring semester began, Mr. Hepperlen met with Ms. Sullivan to again express his worries with C.H.'s ability to keep up with her schoolwork.

45. Ms. Sullivan provided Mr. Hepperlen with a pamphlet of resources for students with attention deficit disorder ("ADD"), although C.H. had not yet been formally diagnosed with ADD.

46. At some point in February of 2020, Ms. Sullivan called Mrs. Hepperlen after an unsettling conversation with C.H., where C.H. had shared that she disliked school. Ms. Sullivan asked Mrs. Hepperlen if she knew why C.H. did not like school, and Mrs. Hepperlen explained again (as she had in the fall of 2019) that C.H. spent 12 hours a day on school because she could not finish her classwork in class. This was a significant indicator that C.H. was struggling with her attention and executive functioning skills.

47. On or around February 13, 2020, C.H. informed her parents that she needed counseling as a result of the STEM School shooting.

48. C.H. began seeing Rose Monk ("Ms. Monk"), a therapist.

49. Ms. Monk observed signs of autism spectrum disorder ("ASD") and ADD within ten minutes of meeting C.H.

50. Ms. Monk screened C.H. for attention deficit hyperactivity disorder ("ADHD") and Executive Functioning Disorder and found that C.H. met 79% of the criteria for ADHD combined with anxiety and 85% of the criteria for issues with Executive Functioning.

51. On March 4, 2020, Mrs. Hepperlen emailed Mrs. Heather Dillon, C.H.'s Language Arts teacher, informing her that C.H. had been diagnosed with ADHD, executive functioning disorder, and CAPD.

52. On March 7, 2020, C.H. was involved with an incident in which she was accused of joking about school shootings and accused of stating that she is always shopping for guns.

53. STEM became involved in the matter on March 10, 2020 after an anonymous report was made about C.H.'s statements.

54. STEM School investigated the matter and decided to suspend C.H. for 10 days as a result of her alleged conduct.

55. On March 12, 2020, STEM School informed Parents that the school would be referring C.H. for expulsion.

56. On March 13, 2020, Ms. Hepperlen emailed Hannah Reese ("Ms. Reese"), STEM's Assistant Director of Special Programs and requested that C.H. be evaluated for an IEP or 504 Plan. She reminded Ms. Reese that C.H. had previously been diagnosed with CAPD as well as Depression, ADD, and Executive Functioning Disorder.

57. Ms. Reese told Ms. Hepperlen that she would forward the request onto Kelly Williams ("Ms. Williams"), STEM School's Special Education Coordinator.

58. On March 24, 2020, Ms. Williams contacted Ms. Hepperlen to schedule a time to meet and speak with C.H.

59. Ms. Hepperlen contacted Ms. Williams on March 25, 2020. During that conversation, Ms. Hepperlen again informed Ms. Williams of C.H.'s diagnoses. Ms. Williams indicated that she was planning on having a "referral meeting" for C.H. with Mr. and Ms. Hepperlen in the upcoming days. Presumably, this "referral meeting" was to refer C.H. for an evaluation for special education services as she instructed Ms. Hepperlen to gather documentation regarding C.H.'s diagnoses.

60. On April 1, 2020, STEM notified C.H. and his parents that C.H. was recommended for expulsion. The School extended C.H.'s suspension by ten additional days to determine if the District would expel him.

61. The District held an expulsion hearing on April 24, 2020, and found expulsion appropriate under Colo. Rev. Stat. § 22-33-106(1)(c). The expulsion was effective from April 24, 2020, to April 23, 2021.

62. Then, in May of 2020, STEM School finally evaluated C.H. for an IEP.

63. Besides District employee Tracy Grove ("Ms. Grove"), who administered the Wechsler Individual Achievement Test – Third Edition (WIATT-III)[2] to C.H., none of the School and District staff that played a part in C.H.'s special education evaluation assessed C.H. in person.

64. School psychologist Rebecca Matson ("Ms. Matson"), School speech and language pathologist Kelly Paquette ("Ms. Paquette"), and School occupational therapist Sharon Groeling ("Ms. Groeling")—the three individuals who completed the Childhood Autism Rating Scale Second Edition (CARS-2)—made no effort to meet with C.H. in person.

---

[2] The WIAT-III assessment is an individually administered clinical instrument designed to measure the achievement of students who are in grades PK-12.

65. Ms. Groeling and Ms. Paquette had never interacted with C.H. at all prior to their Zoom evaluation meetings; thus, they completed the CARS-2 and contributed their own observations without ever having met C.H. in person, nor did they seek a more comprehensive historical history for C.H.

66. Ms. Matson, on the other hand, had met with C.H. for the first time before the evaluation when she completed C.H.'s threat assessment following the alleged misconduct, which ultimately led to C.H.'s expulsion.

67. Although evaluators sought teacher feedback from C.H.'s second semester eighth grade teachers, some of whom had also taught C.H. the previous semester, no evaluator actually conducted a classroom observation of C.H. for the purposes of a special education evaluation.

68. Additionally, teachers provided their feedback at least one month after C.H. was last in their classroom in early March. C.H. had been suspended March 10, and while classes had resumed after spring break remotely, C.H. was not able to attend those classes because of the disciplinary actions instituted by the School and District. Therefore, teacher feedback did not include recent observations of C.H.

69. District evaluators neglected to interview C.H.'s fall semester French teacher, whose class C.H. failed just months prior (exactly the Able Kids Foundation report predicted).

70. District evaluators also gave no weight to C.H.'s poor academic performance in her classes; they asserted instead that the discrepancy between her standardized test scores and her low grades reflected that she was lazy and unmotivated. They failed to acknowledge or explore the possibility that her inability to succeed in the classroom was due to her disabilities.

71. District evaluators ignored signs of C.H.'s ADHD.

72. On the Behavior Assessment System for Children – Third Edition (BASC-3), Ms. Sullivan, Mrs. Hepperlen, and Mrs. Hoffman all rated C.H. in the elevated range in Attention Control. On C.H.'s self-report on the BASC-3, she rated herself in the At-Risk range on the Inattention/Hyperactivity scale, particularly due to her score on the Attention Problems scale. C.H. reported having difficulty maintaining necessary levels of attention.

73. Ms. Matson did no additional testing to further analyze C.H.'s attention problems.

74. Ms. Matson spoke to Ms. Monk to discuss her observations of C.H. after Ms. Monk provided the results of her ADD and executive functioning screening tests.

75. During that conversation, Ms. Matson told Ms. Monk that she knew C.H. had committed the offense for which she was facing expulsion.[3]

76. Ms. Matson—and other District evaluators—conducted the evaluation of C.H. only to run through the motions necessary to proceed with C.H.'s expulsion and *not* to assess whether C.H. required special education.

77. The evaluation concluded that C.H. struggled with anxiety, an undiagnosed speech stutter, central auditory processing disorder, and motivation. However, the evaluation, conducted virtually due to COVID-19, also concluded that Plaintiff displayed "none-to-minimal symptoms" of an autism spectrum disorder.

78. The School and District refused to find that C.H. was eligible for special education and instead provided C.H. with a 504 plan to address her CAPD diagnosis, which the School had knowledge of by August 30, 2019.

---

[3] At the due process hearing, Ms. Matson was asked on redirect whether she had made such a statement to Ms. Monk. She stated that she did not remember. In its closing brief, the District alleged that Ms. Matson had denied making any statements about C.H.'s guilt regarding the March 7 incident. In its decision, the ALJ adopted the District's flawed retelling of the testimony.

79. On July 28, 2020, the District held a manifestation hearing to determine if C.H.'s alleged conduct was a manifestation of her CAPD. The District concluded that her alleged behavior was not a manifestation of her disability, but the District only evaluated this under C.H.'s CAPD.

80. Finally, in August 2020, C.H. was independently evaluated by Dr. Colleen O'Donnell. During this evaluation, Dr. O'Connell diagnosed C.H. with Autism Spectrum Disorder ("ASD") and Attention-Deficit/Hyperactivity Disorder. Dr. O'Connell noted that although the District had previously evaluated C.H. for ASD, it had done so via Zoom than in-person, due to COVID-19. However, this manner of evaluation can cause certain qualities and characteristics to be more difficult to evaluate, and conversations are more stilted and less fluid than they would be in person. Moreover, an individual who prefers online interactions to interpersonal interactions, such as C.H., may perform better in the comfort of her own home than in person. Finally, Dr. O'Connell noted that the District's evaluation almost exclusively focused on C.H.'s current functioning at school and gave less consideration to C.H.'s developmental history and concerns and symptoms observed in earlier phases of development, resulting in the District altogether missing the ASD diagnosis.

81. Importantly, the District never conducted a manifestation hearing to determine if C.H.'s alleged conduct was ever a manifestation of her ASD disability. Instead, the Board of Education only affirmed the District's decision to expel C.H.

82. On September 11, 2020, after Parents had appealed C.H.'s expulsion, the Board of Education issued its Final Determination of Appeal and upheld C.H.'s expulsion.

83. Between July 26-27, 2021, JeffCo School District evaluated C.H. for special education services.

84. On August 13, 2021, JeffCo School District determined C.H. qualified for special education services. JeffCo School District listed ASD as C.H.'s primary disability and acknowledged that this classification also accounted for the many challenges C.H. faced because of her ADD.

85. A finalization of C.H.'s IEP is was scheduled for September 27, 2021.

86. Since then, C.H. has been on an IEP through JeffCo School District.

87. On April 16, 2021, Parents filed a due process complaint with the Colorado Department of Education and the School District's Special Education Director pursuant to the dispute resolution procedures set forth in the IDEA (20 U.S.C. §1415(f)), its implementing regulations (34 C.F.R. §§300.507-300.511), and the ECEA Rules (ECEA Rule 6.02(7.5)).

88. On September 7, 2021, Parents amended their due process complaint, adding factual allegations and claims under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq., and accompanying regulations at 34 C.F.R. §104 *et seq*.

89. On December 20, 2021, the ALJ presiding over the case issued a Prehearing Procedural Order declining to review the Section 504 claims and limiting the issues to: Whether the District violated the rights of C.H. pursuant to the federal Individuals with Disabilities Education Act and/or the Colorado Exceptional Children's Education Act by failing to evaluate whether C.H. met the criteria to be identified as a child with a disability ("Child Find"); assuming C.H. did qualify for special education and related services, whether the District failed to develop and implement an individualized education program ("IEP") for C.H.; whether C.H. was materially deprived of a free appropriate public education; whether the District properly followed procedures for disciplining C.H. if she was, in fact, a child with a disability; and whether the District committed any other procedural violations that may or may not have caused substantive educational harm.

90. The due process hearing was held before the ALJ at the Colorado Office of Administrative Courts between March 28 and March 31, 2022.

91. The ALJ issued his Agency Decision on May 5, 2022.[4] He found that the School District did not violate any provisions of the IDEA.

## IV. FIRST CLAIM FOR RELIEF

### (Violation of 20 U.S.C. §1412)

92. Plaintiff incorporates the allegations set forth above as if fully set forth herein.

93. The IDEA requires that the School District make a free appropriate public education ("FAPE") available to all children with disabilities, including C.H

94. The School District's substantive violations of the IDEA resulted in a denial of a FAPE to C.H.

## V. SECOND CLAIM FOR RELIEF

### (Violation of 34 C.F.R. §300.101 and 300.17)

95. Plaintiff incorporates the allegations set forth above as if fully set forth herein.

96. The IDEA's implementing regulations require the District make a FAPE available to all children with disabilities, including C.H.

97. The District's substantive violations of the IDEA resulted in a denial of a free appropriate public education to C.H.

## VI. THIRD CLAIM FOR RELIEF

### (Violation of 34 CFR § 300.111)

98. Plaintiff incorporates the allegations set forth above as if fully set forth herein.

99. The IDEA requires that the states identify, locate, and evaluate all children in need of special education and related services.

---

[4] The decision was signed by the ALJ on May 4, 2022 but issued on May 5, 2022.

100.    Districts are responsible for conducting child find and identifying all IDEA-eligible students that reside in their jurisdiction.

101.    The District violated child find when it continuously neglected and refused to conduct a special education evaluation of C.H., despite a growing body of evidence reflecting the likelihood that she had a disability that impacted her education.

## VII. FOURTH CLAIM FOR RELIEF

### (Violation of 34 CFR § 300.324)

102.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

103.    The District has a legal obligation to create IEPs for all students with disabilities that qualify for special education.

104.    Despite the District's contrary conclusion, C.H. qualified for special education, and thus, the District should have created and implemented a proper IEP for C.H.

## VIII. FIFTH CLAIM FOR RELIEF

### (Violation of 34 C.F.R. § 300.530 (e) and 34 CFR § 300.534)

105.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

106.    The protections of IDEA and manifestation determination reviews apply to students not yet determined to be eligible under the special circumstances found in 34 CFR § 300.534.

107.    Those circumstances apply here as C.H.'s parents requested an evaluation and STEM knew there were concerns for C.H's academic performance.

108.    STEM and the District only considered if C.H.'s alleged behaviors were related to her CAPD, despite C.H. struggling with many other issues including ADHD, executive functioning, and ASD, though undiagnosed at the time.

## IX. SIXTH CLAIM FOR RELIEF

**(Violation of 34 C.F.R. § 104.33)**

109.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

110.    FAPE under Section 504 requires that districts provide education or related services designed to meet the needs of students with disabilities as adequately as the district meets the needs of students without disabilities.

111.    The District failed to provide C.H. with a Section 504 plan in October 2019 when it failed to actually evaluate C.H. and then held a meeting without C.H.'s parents present to determine she did not qualify for a Section 504 plan. A Section 504 plan was only provided after she was referred for expulsion and after some evaluations were actually provided.

## X. SEVENTH CLAIM FOR RELIEF

**(Violation of 34 C.F.R. §104.32 and 34 C.F.R. §104.35)**

112.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

113.    The District failed its affirmative duty to locate and evaluate C.H. for special education or related services under Section 504.

114.    The District knew that C.H. was a child with a disability (CAPD) on August 30, 2019 when it received the Able Kids report, and then additionally learned that C.H. Had other disabilities (ADHD, executive functioning disorder) in March of 2020. Additionally, the District was aware that C.H. was struggling academically, despite being exceptionally gifted.

115.    Instead of seeking a solution to C.H.'s academic and social needs, it ignored C.H.'s issues as well as ignored is Child Find obligations.

## XI. EIGHTH CLAIM FOR RELIEF

**(Violation of 34 CFR §104.35)**

116.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

117.   Under Section 504, a recipient that operates a public elementary or secondary education program or activity must conduct an evaluation of any person who needs or is believed to need special education or related services before taking any action with respect to the initial placement of the person.

118.   STEM failed to evaluate C.H. until April of 2020, despite having knowledge of at least one of her disabilities since August of 2019.

## XII. NINTH CLAIM FOR RELIEF

### (Violation of 34 CFR §104.33)

119.   Plaintiff incorporates the allegations set forth above as if fully set forth herein.

120.   STEM School failed to develop a proper Section 504 Plan in the fall of 2019 when it was clear that C.H. required, at the very least, accommodations for her CAPD.

## XIII. TENTH CLAIM FOR RELIEF

### (Violation of 34 CFR §104.35(a))

121.   Plaintiff incorporates the allegations set forth above as if fully set forth herein.

122.   A child with a Section 504 plan is entitled to a manifestation determination review prior to a significant change in placement.

123.   The District failed to conduct a proper manifestation determination review because it only considered C.H.'s alleged behaviors were a manifestation of her CAPD, despite C.H. struggling with many other issues, including ADHD, anxiety, executive functioning, and ASD, though undiagnosed at the time.

## XIV. ELEVENTH CLAIM FOR RELIEF

### (42 U.S. § 1983 For Violation of First Amendment, U.S. Const. amend. I)

124.   Plaintiff incorporates the allegations set forth above as if fully set forth herein.

125.    Colo. Rev. Stat § 22-33-106(c), which governs when a student may be suspended or expelled from a public school, is unconstitutional because it is overbroad and void for vagueness.

126.    A law is unconstitutionally vague if (1) "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or (2) "it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

127.    To be overbroad, a statute must be substantially overbroad. *Broadrick v. Oklahoma*, 413 U.S. 601, 615-16 (1973) ([T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.").

128.    Here, Colo. Rev. Stat. § 22-33-106(1)(c) is both vague and overbroad because the statute prohibits "[b]ehavior on or off school property that is detrimental to the welfare or safety of other pupils or of school personnel, including behavior that creates a threat of physical harm to the child or to other children." The statute provides no guidance beyond this language; it provides no indication of what behavior specifically is allowed or prohibited, so long as it is not "detrimental to the welfare of safety" of others.

129.    This statute provides school districts unrestricted reach into every aspect of students' lives, even off campus and outside of school hours.

130.    This statute gives schools unfettered access to monitor students on and off school grounds, and to discipline them for actions taken at any time. Its vagueness does not inform a reasonable person of the prohibited conduct, and instead leaves those interpreting it to guess as to the parameters of the school's reach. This thereby inhibits students from acting and speaking outside of school, for fear of discipline by schools. *Hill*, 530 U.S. at 532.

131.    The statute is also overbroad in that it collectively allows schools to extend their arms into students' personal lives and discipline them for speech that occurs off-campus and that is not related to school activities.

132.    Such a sweeping reach will inherently interfere with student speech, especially student speech off-campus.

133.    Any statute that chills free speech, especially that of students beyond school grounds, must be unconstitutional.

134.    The District expelled C.H. for speech she allegedly participated in while off of school ground.

135.    By expelling C.H. under Colo. Rev. Stat. § 22-33-106(1)(c), a statute which is both vague and overbroad, the District violated C.H.'s First Amendment rights.

## XIV. REQUEST FOR RELIEF

136.    Plaintiff respectfully requests that this Court reverse the ALJ's Decision regarding claims one through five and enter judgement in her favor and against Defendants as follows:

137.    Awarding Plaintiff monetary damages for out-of-pocket expenses in amounts to be established at trial;

138.    Awarding Plaintiff compensatory services dating back to April 2019;

139.    Awarding Plaintiff reasonable attorney's fees, litigation expenses, and costs incurred in this action and the related administrative proceedings;

140.    Ordering Defendant to remove Plaintiff's expulsion from her school records;

141.    Awarding the Plaintiff any additional and further relief that the Court finds equitable, appropriate, or just.

## XV. DEMAND FOR A JURY TRIAL

Plaintiff respectfully requests a jury decide the issues related to claims six through ten, while the Court decides claims one through five by review of the due process proceedings.

Respectfully submitted on August 2, 2022.


*s/ Miriam Kerler*
Miriam Kerler
Claire Poundstone
Kishinevsky & Raykin, Attorneys at Law
2851 S. Parker Rd., Suite 150
Aurora, CO 80014
Phone: 720-748-8888
miriam@coloradolawteam.com
claire@coloradolawteam.com
**Attorneys for Plaintiff**